**ASSOCIATION OF DATA PROCESSING SERVICE ORGANIZATIONS, INC. and United Data Processing, Inc., Mid Continent (Amicus Curiae), Plaintiffs,**

v.

**FEDERAL HOME LOAN BANK OF CINCINNATI et al., Defendants.**

Civ. No. 8999.

United States District Court, S. D. Ohio, W. D.

Sept. 27, 1976.

---

Gerald W. Simmons, Cincinnati, Ohio, Herbert E. Marks, Washington, D. C., Robt. Showalter, Denver, Colo., for plaintiffs.

Murray S. Monroe, Cincinnati, Ohio, Daniel J. Goldberg, Juan A. del Real, Washington, D. C., for defendants.

## FINDINGS OF FACT, OPINION, AND CONCLUSIONS OF LAW

CARL B. RUBIN, District Judge.

This matter is before the Court for final disposition based upon dispositive motions of the parties together with the appropriate memoranda for and against such motions.[1]

Plaintiffs question the authority of defendants to provide data processing service to those building and loan associations which are members of the Federal Home Loan Bank system. Pursuant to Rule 52 of the Federal Rules of Civil Procedure, the Court does submit herewith its findings of fact and conclusions of law.

## I

### FINDINGS OF FACT

1. Plaintiff, Association of Data Processing Service Organizations, Inc. is a New York nonprofit corporation. It is a national trade association for independent data processing companies. So far as it is pertinent in this matter, such companies have the capability of providing data processing by computer equivalent to that provided by the Federal Home Loan Banks.

2. Plaintiff, United Data Processing, Inc. is an Ohio corporation which provides data processing services to the general public, including savings and loan associations and other savings institutions.

3. The defendant Federal Home Loan Bank of Cincinnati is one of twelve federal home loan banks established pursuant to the Federal Home Loan Bank Act, 12 U.S.C. § 1421 *et seq.* Section 1423 of such Act provides for the establishment in each district of a federal home loan bank at a city so designated. By virtue of its creation, such defendant is a federal instrumentality.

4. The defendant Federal Home Loan Bank Board is a federal agency created by the Federal Home Loan Bank Act. Such Board is referred to specifically in 12 U.S.C. § 1437 and pursuant thereto it exercises supervisory authority over defendant Federal Home Loan Bank of Cincinnati and the other federal home loan banks.

Individual defendants Thomas R. Boman and Grady Perry, Jr. are individual members of the Federal Home Loan Bank Board. Pursuant to 12 U.S.C. § 1437, they were appointed to such Board by the President of the United States. Unless otherwise specifically stated, their connection with this litigation will be deemed to be as members of the Board and not as individuals.

5. Intervening defendants Federal Home Loan Banks of New York, Chicago, Pitts-

---

[1]. The motions are: (1) plaintiffs' motion for summary judgment (filed March 4, 1974, Doc. No. 11); (2) cross motion of defendants Federal Home Loan Bank Board, Thomas R. Bomar and Grady Perry, Jr. for summary judgment (filed July 31, 1975, Doc. No. 53); (3) cross motion of Intervenors the Federal Home Loan Bank of New York, Federal Home Loan Bank of Chicago, Federal Home Loan Bank of Pittsburgh and Federal Home Loan Bank of Des Moines for summary judgment (filed August 1, 1975, Doc. No. 54); (4) cross motion of defendant Federal Home Loan Bank of Cincinnati for summary judgment (filed September 18, 1975, ⌐oc. No. 71; (5) cross motion of defendant Federal Home Loan Bank of Cincinnati for summary judgment for plaintiffs' failure to establish a legal right to maintain a suit on the basis of the Federal Home Loan Bank Act (filed September 18, 1975, Doc. No. 73); (6) cross motion of Intervenors for summary judgment on the ground of laches (filed August 1, 1975, Doc. No. 55); cross motion of the Federal Home Loan Bank Board for summary judgment on the ground of laches (filed August 25, 1975, Doc. No. 65); and (8) cross motion of defendant Federal Home Loan Bank of Cincinnati for summary judgment on the ground of laches (filed September 18, 1975, Doc. No. 73).

burgh and Des Moines are four of the other eleven federal home loan banks similar in organization to the Federal Home Loan Bank of Cincinnati. They were created in accordance with 12 U.S.C. § 1423. Intervention in this matter was permitted by order of this Court on April 15, 1974.

6. In January of 1970 the Federal Home Loan Bank of New York began offering data processing services to its member savings and loan associations.[2] Authority for such services was contained in Board Resolution 22183, dated October 13, 1968.

On October 19, 1970, the Federal Home Loan Bank Board issued Resolution 70–327 permitting Federal Home Loan Banks to provide on-line savings, mortgage and general ledger data processing services.[3] Resolution 70–327 contained the following: "such services shall be provided only if acceptable comparable services are not otherwise conveniently available to member institutions."

On January 23, 1972, Resolution 70–327 was rescinded and in its place Resolution 72–186 was adopted February 10, 1972. Such replacement resolution did not limit the offering of services where acceptable comparable services were not conveniently available but did express a desire "to assure that the provision of such services will not be unduly injurious to other private entities providing such services."

Approval of a request to provide on-line service by defendant Federal Home Loan Bank of Cincinnati was given in October of 1970.

7. On-line services relate to the day-to-day business operations of the member savings and loan institutions. Equivalent services can be provided by commercial data processors, such as plaintiff UDP. These services are commercial business activities, and are provided to the member savings and loan institutions in direct competition with plaintiff members including plaintiff United Data Processing, Inc.

8. Beginning in May, 1971, plaintiff expressed concern over the data processing activities of defendant. Plaintiffs were advised of Resolution 70–327 and took no further action. Upon learning of the rescission of Resolution 70–327 in February, 1972, plaintiffs made frequent protests against the competition. Defendant Federal Home Loan Bank Board was aware of such protests and chose to ignore them. This action was commenced in October, 1973. The data processing activities of defendant continue to this time.

II

OPINION

A. *Nature of Judicial Inquiry*

■ We deal with an inquiry into statutory authorization of conduct. Is defendants' action, in providing commercial data processing services to its member savings and loan institutions, authorized by the Federal Home Loan Bank Act? Where the authorization is clear, a challenge to the choice of an exercising authority based upon interpretation of the facts would require a "rational basis" test, i. e., if such authority's choice were supported on a rational basis a court could not substitute its own judgment.

■ We do not review herein an agency choice based upon facts within its particular

**2.** The terms "building & loan associations", "savings and loan associations" and "thrift associations" are used interchangeably herein. All such references deal with home lending institutions other than banks, insurance companies or similar lenders.

**3.** On-line data processing requires the use of computer terminals at the thrift institution's teller windows connected via telephone lines to a main computer located on the premises of a

data processing service center. As each depositor's transaction is processed through the institution's teller terminal, the data is transmitted electronically to the main computer, where the particular customer's account information is stored in the computer's memory bank. The computer up-dates the account information and then instantaneously transmits the data back to the teller's window terminal. The entire process normally occurs within one or two seconds.

area of expertise. We must instead examine an enabling statute for an expression of authority. Such examination involves a "substitution of judicial judgment" standard.[4]

We base this conclusion upon *Barlow v. Collins*, 397 U.S. 159, 90 S.Ct. 832, 25 L.Ed.2d 192 (1970):

> [S]ince the only or principal dispute relates to the meaning of the statutory term, the controversy must ultimately be resolved, not on the basis of matters within the special competence of the Secretary, but by judicial application of canons of statutory construction. *See Texas Gas Transmission Corp. v. Shell Oil Co.*, 363 U.S. 263, 268–270, 80 S.Ct. 1122, 4 L.Ed.2d 1208, "The role of the courts should, in particular, be viewed hospitably where . . . the question sought to be reviewed does not significantly engage the agency's expertise. '[W]here the only principal dispute relates to the meaning of the statutory term' . . . [the controversy] presents issues on which courts, and not [administrators], are relatively more expert." *Hardin v. Kentucky Utilities Co.*, 390 U.S. 1, 14, 88 S.Ct. 651, 19 L.Ed.2d 787 (Harlan, J. dissenting.)

*Barlow v. Collins, supra* at 166, 90 S.Ct. at 837.

*Barlow* is but one decision on this subject. It rests upon substantial precedent. Other pronouncements by the Supreme Court make the role of the judiciary quite clear:

> The deference owed to an expert tribunal cannot be allowed to slip into a judicial inertia *which results in the unauthorized* assumption by an *agency of major policy decisions properly made by Congress.* (emphasis added.)

*American Ship Bldg. Co. v. NLRB*, 380 U.S. 300, 318, 85 S.Ct. 955, 967, 13 L.Ed.2d 855 (1965).

> *Undoubtedly questions of statutory interpretation, especially when arising in the first instance in judicial proceedings*, are *for the courts to resolve, giving appropriate weight to the judgment of those whose special duty is to administer the questioned statute.* . . . But where the question is one of specific application of a broad statutory term in a proceeding in which the agency administering the statute must determine it initially, the reviewing court's function is limited. (emphasis added.)

*NLRB v. Hearst Publications, Inc.*, 322 U.S. 111, 130–131, 64 S.Ct. 851, 860, 88 L.Ed. 1170 (1944).

There is even an indication that for a court not to review the agency's construction would be an abdication of the court's responsibility:

> While this Court has announced that it will accord great weight to a departmental construction of its own enabling legislation, especially in a contemporaneous construction, . . . it is only one input in the interpretational equation.
>
> . . .
>
> The Court may not, however, abdicate its ultimate responsibility to construe the language employed by Congress.

*Zuber v. Allen*, 396 U.S. 168, 90 S.Ct. 314, 24 L.Ed.2d 345 (1969).

### B. *Standing*

█ In 1969 the Supreme Court of the United States addressed the question of standing in the case of *Association of Data Processing Service Organizations, Inc. v. Camp, Comptroller of the Currency*, 397

---

4. In 1963 James J. Saxon, the Comptroller of the Currency, in addition to authorizing national banks to engage in the travel agency business allowed them to enter the insurance business, underwriting business, mutual investment fund business and the armored car and courier business.

Every one of these other 1963 rulings which have been challenged on their merits has subsequently been struck down by the courts.

In none of these cases, despite the fact that agency expertise was more directly involved than it is here, was the ruling of the Comptroller permitted to control over what the court thought was the correct construction of the relevant statute.

*Arnold Tours, Inc. v. Camp*, 472 F.2d 427, 436 (1st Cir. 1972).

U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970). The plaintiff in that case is the plaintiff herein. It challenged a ruling by the Comptroller of the Currency which permitted national banks as an incident to their banking service to make data processing services available to other banks and bank customers. The Supreme Court held that the petitioner had standing to maintain the action. Petitioner satisfied the case or controversy test of Article III of the Constitution and demonstrated that the interest sought to be protected was arguably within the zone of interests to be protected or regulated by the statutes. Plaintiff was held to be an aggrieved person under Section 702 of the Administrative Procedure Act.

It is difficult to draw a distinction between standing of this plaintiff in a controversy with the Comptroller of the Currency and its standing in the identical issue in a controversy with the Federal Home Loan Bank Board.[5]

### C.  Laches

■ The defendants and intervenors have moved for summary judgment asserting the affirmative defense of laches. To prevail on the equitable defense of laches a defendant must prove all of the following: (1) prior knowledge on the part of the plaintiff of the acts complained of; (2) lack of diligence in the assertion of plaintiff's legal remedies; and (3) intervening prejudice to the defendant or others. *Holmberg v. Armbrecht*, 327 U.S. 392, 396, 66 S.Ct. 582, 90 L.Ed. 743 (1946); *Costello v. United States*, 365 U.S. 265, 282, 81 S.Ct. 534, 5 L.Ed.2d 551 (1961); *Hays v. Port of Seattle*, 251 U.S. 233, 239, 40 S.Ct. 125, 64 L.Ed. 243 (1920).

We direct our inquiry to the question of lack of diligence, or unreasonable delay on the part of plaintiffs.

■ It is well settled that "time cannot make legal that which is illegally conceived," and that laches may be enforced

only where unreasonable delay by a claimant and undue prejudice to an adverse party combine so as to equitably "bar the capacity of allegedly injured persons to complain of the transaction." *Landell v. Northern Pacific Railway Co.*, 122 F.Supp. 253, 255 (D.D.C.1954), aff'd 96 U.S.App.D.C. 24, 223 F.2d 316 (1955), *cert. denied*, 350 U.S. 844, 76 S.Ct. 85, 100 L.Ed. 752 (1955), citing *Order of Railroad Telegraphers v. Railway Express Agency, Inc.*, 321 U.S. 342, 349, 64 S.Ct. 582, 88 L.Ed. 788 (1944).

■ A consideration of the equitable doctrine of laches must include the relationship of the parties to each other. We note defendant's specific limitation upon competition with private industry in Resolution 70–327 and its general policy of noninjury to private entities in Resolution 72–186 (Findings of Fact 6, 7, 8).

■ An expression of policy by a Federal agency should entitle a potential adversary to rely at least for a time upon the bona fides of such agency. A suit filed within twenty months of such policy assertion does not appear to this Court to be a lack of due diligence.

Defendants have failed to establish such a lack of diligence that would create intervening prejudice to them. In view of defendants failure to establish the second prong of the test, it is not necessary for the Court to consider the first and third prongs thereof.

### D.  Merits

We turn to a consideration of the merits of this controversy. This matter deals with an effort by the Federal Home Loan Banks to provide a data processing service relating to the day-to-day business operations of the member savings and loan institutions. In order to understand the nature of the problem, a background inquiry into the formation of the Federal Home Loan Banks is advisable. The Federal Home Loan Bank

---

**5.** The nature of judicial inquiry and standing have been issues routinely raised by administrative agencies and uniformly decided against the position of defendants. See cases cited page 392, *infra*.

Act, 12 U.S.C. § 1421, *et seq.*, dates back to the 72nd Congress and its session in June, 1932.

The reference to 1932 alone is sufficient to recall the economic circumstances of the time. They included widespread unemployment, unprecedented business failures, home foreclosures, bank failures and an economic paralysis that threatened the security of the nation. Among the remedial legislation proposed in the 72nd Congress was a bill intended to relieve the plight of building and loan associations without funds, homeowners without an ability to pay mortgages, and an entire home mortgage industry paralyzed by "frozen assets".

In essence, that bill which became the Federal Home Loan Bank Act created a source of funds available to building and loan associations for new loans and for operating capital that would remove the necessity of foreclosing on existing mortgages. Such associations borrow funds by pledging existing mortgages. The Congressional debates are illuminating on this point. When stripped of the rhetoric that might be expected in an election year, the purpose in the minds of the congressmen becomes abundantly clear.

Mr. Overton of Louisiana:

Mr. Chairman, the Federal Home Loan Bank Bill is twofold in its purpose and effect. It is intended both as a present emergency relief of and as a permanent aid to a class of institutions and a character of people which and who constitute the most stabilizing influence in our national life . . . ..

. . . . .

The Federal Reserve System was enacted to provide a large reservoir of credit for commercial and industrial interests. The Federal Farm Loan Act provides national credit for farm loans. The intermediate credit system which is subsidiary to the latter is designed to supplement the credit for agriculture in providing short-term loans . . . .. The home financing field has been left out of this national credit program. The present bill propos-

es to include it in the national credit scheme.

. . . . .

The effect of this bill will be to render liquid long-term amortized home loans. The setup of the home loan banks in each section of the country will constitute a clearinghouse between the areas in which there are available surpluses of money for home loan purposes and those areas in which the demand for such loans exceeds the supply of money therefor.
Congressional Record, 72nd Congress, pages 12603–12605.

Mr. Sweeney of Ohio:

This bill will do something for the little fellow; the fellow who has a family, the fellow who wants to paint his house or who wants to refinance his mortgage to keep a shelter over his family . . . .
Congressional Record, 72nd Congress, page 12606.

Mr. Hancock of North Carolina:

The Federal Home Loan Bank Bill is designed primarily to foster the development of the American home . . . . If home ownership in America is to be fostered . . . . we must make provision for a continuous and adequate stream of credit in the home financing field and make certain that such credit will be available in periods of business depression even more than in periods of prosperity. This is precisely the purpose of the Federal Home Loan Bank Bill. It is designed not only to assist home financing institutions in supplying the much needed credit during periods of economic emergency, but also by setting up a permanent system to make available the type of credit which is so essential, namely long-term monthly installment credit. . . .
Congressional Record, 72nd Congress, pages 12606–12607.

. . . . .

No bank may transact any banking or other business unless expressly authorized by the Act.
The funds which may be deposited by member institutions with the Federal

Home Loan Banks are those which have been placed in these institutions to be used in the home financing field. . . . Since these funds have been definitely earmarked for home financing purposes, their deposit with the Federal Home Loan Banks will in no way be detrimental to the commercial or agricultural interests of the country. . . .
Congressional Record, 72nd Congress, page 12610.

The providing of services to member associations is not an expressed purpose and if it exists as a valid exercise of power it must be an "incidental" rather than an "expressed" power. It is quite clear that Congress intended only a limited and specific function for the Federal Home Loan Banks.

The authority of defendants to provide the services in question is arguably afforded by §§ 11(a), 12(a) and 17(a). § 11(a) states in part:

Each Federal Home Loan Bank shall have power . . . to do all things necessary for carrying out the provisions of this Chapter and all things incident thereto. (12 U.S.C. § 1431(a))

§ 12(a) provides in part:

Each such Bank shall have all such incidental powers, not inconsistent with the provisions of this chapter, as are customary and usual in corporations generally. (12 U.S.C. § 1432(a))

§ 17(a) provides in part:

The board . . . shall have power to adopt, amend and require the observance of such rules, regulations and orders as shall be necessary from time to time for carrying out the purposes or the provisions of this chapter. (12 U.S.C. § 1437(a))

All of the foregoing are clearly limited by § 11(e) providing as follows:

[N]o Federal Home Loan *Bank shall transact* any *banking* or *other business* not authorized by this chapter. (emphasis added) (12 U.S.C. § 1431(e)).

For purposes of analogy these powers may be contrasted with powers given to the Comptroller of the Currency in 12 U.S.C. § 24 which grants:

[A]ll such *incidental* powers as shall be necessary *to carry* on the *business of banking* . . . . (emphasis added).

The statutorily broader powers of the Comptroller of the Currency have been subjected to substantially more judicial scrutiny than the powers of the Federal Home Loan Banks.

That scrutiny has resulted in material limitations. The Comptroller of the Currency has been barred from providing armored car services without regard to state branch banking laws, *First National Bank v. Dickinson,* 396 U.S. 122, 90 S.Ct. 337, 24 L.Ed.2d 312 (1969); from operating collective investment funds, *Investment Company Institute et al. v. Camp,* 401 U.S. 617, 91 S.Ct. 1091, 28 L.Ed.2d 367 (1971); from operating a full-scale travel agency, *Arnold Tours, Inc. v. Camp,* 472 F.2d 427 (1st Cir. 1972); from underwriting and dealing in obligations of states and political subdivisions not secured by general power of taxation, *Baker, Watts & Co. v. Saxon, Comptroller of the Currency,* 261 F.Supp. 247 (D.C.1966), *aff'd,* 129 U.S.App.D.C. 173, 392 F.2d 497 (1968); from operating as insurance agents in a place having a population in excess of 5,000 inhabitants, *Georgia Association of Independent Insurance Agents, Inc. v. Saxon, Comptroller of the Currency,* 268 F.Supp. 236 (N.D.Ga.1967), *aff'd,* 399 F.2d 1010 (5th Cir. 1968); from engaging in closed end vehicle leasing transactions, *M & M Leasing Corporation v. Seattle First National Bank,* 391 F.Supp. 1290 (D.Wash. 1975); and from making data processing services available to bank customers, *National Retailers Corporation of Arizona v. Valley National Bank,* 411 F.Supp. 308 (D.Ariz.1976).[6]

In each of the above instances the Comptroller of the Currency argued that there was incidental authority to perform these

---

**6.** An excellent analysis of the nature of data processing services and its relationship to a federal entity comparable to the defendant herein may be found in the *Valley National Bank* case, *supra.*

functions. In each instance an appropriate court disagreed.

It is not pertinent to this inquiry to consider whether or not the data processing services are convenient or profitable or advantageous. It is necessary to determine whether such services are incidental and necessary to the statutory function entrusted to the agency in question.

Such an inquiry has repeatedly been made as to the less restrictive confines of the Comptroller of the Currency. In *Arnold Tours, Inc. v. Camp, supra,* a test of incidental powers was articulated as follows:

> In our opinion, these decisions amply demonstrate that a national bank's activity is authorized as an incidental power, "necessary to carry on the business of banking" within the meaning of 12 U.S.C. § 24, Seventh, if it *is convenient or useful* in connection *with the performance of one* of the bank's *established activities* pursuant to its *express power* under the National Bank Act. If this connection between an incidental activity and an express power does not exist, the activity is not authorized as an incidental power. *Arnold Tours, Inc. v. Camp, supra* at 432. (emphasis added).

Lacking an express power to perform services for its member institutions and faced with the specific prohibitions of § 11(e), this Court can only conclude that the providing of data processing services is beyond the lawful activity of defendant.

## III

### CONCLUSIONS OF LAW

A. This Court has jurisdiction in the present case pursuant to 12 U.S.C. § 1432, 28 U.S.C. § 1331, 28 U.S.C. § 1337, 28 U.S.C. § 2201 and 28 U.S.C. § 1491. This action arises under the provisions of the Federal Home Loan Bank Act, 12 U.S.C. §§ 1421–1449 and the amount in controversy is in excess of ten thousand dollars, exclusive of interest and costs.

B. A determination of the extent of an agency's statutory powers is not within the realm of that agency's "special competence". A court may make its own independent determination of the correct application of the governing principles. *Texas Gas Transmission Corp. v. Shell Oil Co.,* 363 U.S. 263, 270, 80 S.Ct. 1122, 4 L.Ed.2d 1208 (1960).

C. An association of private data processing companies has standing to question a determination of the Federal Home Loan Bank Board and Federal Home Loan Banks to provide such services to member institutions in competition with such association. *Association of Data Processing Service Organization, Inc. v. Camp, Comptroller of the Currency,* 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970).

D. Where a federal agency by stated policy sought to avoid competition with private enterprise, an action asserting justiciable rights against such agency brought within twenty months of the termination of such policy does not demonstrate such a lack of diligence that would require dismissal. *Holmberg v. Armbrecht,* 327 U.S. 392, 66 S.Ct. 582, 90 L.Ed. 743 (1946).

E. The providing of data processing services to member institutions is not an express power granted to the Federal Home Loan Banks or Federal Home Loan Bank Board by the Federal Home Loan Bank Act, 12 U.S.C. § 1421 *et seq.*

F. Such services are neither convenient to nor useful to the performance of an established activity carried on pursuant to an express power. *Arnold Tours, Inc. v. Camp,* 472 F.2d 427 (1st Cir. 1972).

G. The pending motions should be and are hereby disposed of as follows:

(1) the plaintiffs' motion for summary judgment is hereby GRANTED;

(2) the cross motion of defendant Federal Home Loan Bank Board, Thomas R. Boman and Grady Perry, Jr. for summary judgment is hereby DENIED;

(3) the cross motion of the Federal Home Loan Bank Board of New York, Federal Home Loan Bank Board of Chi-

cago, Federal Home Loan Bank Board of Pittsburgh, and the Federal Home Loan Bank Board of Des Moines for summary judgment is hereby DENIED;

(4) the cross motion of defendant Federal Home Loan Bank of Cincinnati for summary judgment is hereby DENIED;

(5) the cross motion of defendant Federal Home Loan Bank of Cincinnati for summary judgment on the ground of plaintiffs' failure to establish a legal interest to maintain a suit on the basis of the Federal Home Loan Bank Act is hereby DENIED;

(6) the cross motion of defendant Federal Home Loan Bank of New York, Federal Home Loan Bank of Chicago, Federal Home Loan Bank of Pittsburgh, and Federal Home Loan Bank of Des Moines for summary judgment on the ground of laches is hereby DENIED;

(7) the cross motion of defendant Federal Home Loan Bank Board, Thomas R. Boman, and Grady Perry, Jr. for summary judgment on the ground of laches is hereby DENIED; and

(8) the cross motion of the defendant Federal Home Loan Bank of Cincinnati for summary judgment on the ground of laches is hereby DENIED.

H. The Court hereby finds, declares, and orders that the authorization issued by defendant Federal Home Loan Bank Board to defendant and intervenor Federal Home Loan Banks of Cincinnati, New York, Chicago, Pittsburgh, and Des Moines purporting to approve the data processing services of the defendant and intervenor Federal Home Loan Banks complained of in the present action is illegal and void and of no force and effect by reason of being in excess of statutory authority and contrary to law; this Court hereby permanently enjoins defendant and intervenor Federal Home Loan Banks of Cincinnati, New York, Chicago, Pittsburgh and Des Moines from engaging in the above-mentioned data processing services for thrift institutions com-

ing within their jurisdiction; this Court hereby permanently enjoins defendants Thomas R. Boman and Grady Perry, Jr. from authorizing the sale of commercial data processing services by Federal Home Loan Banks.

The foregoing injunctions are hereby STAYED until January 1, 1977, and on that date they shall become fully effective.

LET JUDGMENT ISSUE IN ACCORDANCE WITH THE FOREGOING.